UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In re | : | |
| **Curtis James Jackson III,** | : | |
| Debtor | : | **District Court No.: 3:21-cv-00911(VLB)** |
| | : | |
| | : | **Bankruptcy Court No.: 15-21233(AMN)** |
| **Curtis James Jackson III,** | : | |
| **Appellant** | : | |
| v. | : | **Adv. Pro. No.: 17-02005 (AMN)** |
| **Reed Smith LLP, and** | : | |
| **Peter Raymond,** | : | June 30, 2023 |
| **Appellees** | : | |
| | : | |

**MEMORANDUM OF DECISION**

        This appeal arises from an adversary proceeding connected to appellant Curtis James Jackson, III's Chapter 11 bankruptcy petition.  After Jackson—better known as the rapper, 50 Cent—filed for bankruptcy in 2015, appellees Reed Smith, LLP and one of its former partners, Peter Raymond filed a proof of claim, contending that Jackson owed them $609,235.41 in attorneys' fees and costs. Jackson lodged five counterclaims against Reed Smith and Raymond for legal malpractice and breach of fiduciary duty.  (AP ECF 1 (Obj. & Countercl.).)[1]

        The counterclaims' underlying facts concern Appellees' representation of Jackson in a lawsuit filed by Lastonia Leviston, a woman depicted in a sexually explicit video ("Video").  She alleged Jackson's  publication of the Video without her consent violated New York state law and constituted intentional infliction of emotional distress ("IIED").  Jackson terminated Appellees a few months before

_____

[1] Citations to filings in adversary proceeding no. 17-02005 are noted by "AP ECF."

**1**

trial.  With replacement counsel, the jury returned a $7,000,000 verdict in favor of Leviston.

Appellees moved to dismiss Jackson's operative counterclaims.  The bankruptcy court dismissed nearly all counterclaims except a portion of Count 2: whether Appellees committed legal malpractice by failing to conduct and preserve discovery of three witnesses, which, if conducted, would have mitigated or absolved Jackson's damages.  (AP ECF 62 (Dec. Mot. Dismiss) at 23.)   After discovery concluded, Appellees moved for summary judgment on the remaining counterclaim.  The bankruptcy court granted summary judgment in favor of Appellees.  (AP ECF 395 (Dec. Mot. Summ. J.) at 58.)[2]  This appeal followed.

I.    BACKGROUND

The Court presumes familiarity with the facts and evidence but includes this Background for the reader's benefit.  Because this appeal involves the bankruptcy court's decisions on the motion to dismiss and motion for summary judgment, the Court will first cite to the pleadings and transition in section I.C to discussing evidence relevant to the appeal.

A.   The Parties and their Attorney-Client Relationship

Appellant Curtis James Jackson, III, also known as 50 Cent, is a well-known rap music performer, entertainer, and entrepreneur.  (AP ECF 22 (Am. Obj. & Countercl.) ¶ 6.)  On February 2, 2004, Jackson entered into a retainer agreement

---

[2] In addition to Jackson's counterclaims, the parties litigated his objections to the proof of claim.  The bankruptcy court denied the motion to dismiss on three grounds: " (1) an alleged violation of 22 NYCRR 1215.1; (2) an alleged conflict of interest; and (3) excessiveness pursuant to Bankruptcy Code § 502(b)(4)."  (*Id.* at 57.)  Appellees only moved for summary judgment on the third issue, and the bankruptcy court denied the motion.  (*See id.*)  These objections are not part of the appeal.

with Appellees Reed Smith LLP and one of its partners, Peter Raymond (together, "Appellees"), to represent him on certain legal matters ("Retainer").[3]  (*Id.* ¶ 42.) This Retainer is the only fee agreement between the parties.  (AP ECF 22 ¶ 24.) Appellees represented Jackson until they were terminated on March 27, 2015.  (*Id.* ¶ 108.)

The Retainer contemplated the scope of representation and discharge.  The first sentence indicates, "We are pleased that you desire to have us represent you in connection with certain of your activities in the entertainment business and with respect to third party claims and lawsuits that have been filed against you."  (AP ECF 22-8 at 1.)  Either party could terminate the agreement "at any time by written notice, subject to [Jackson's] obligation to pay [Appellees'] fees as described below and subject on [Appellees'] part to applicable rules of professional conduct." (*Id.*)

The Retainer also explained Appellees' co-counsel relationship with Jackson's attorney, Theodor K. Sedlmayr of Sedlmayr & Associates.  (*Id.* at 3.) Namely, "Reed Smith LLP has agreed to compensate Mr. Sedlmayr for his services as liaison to Reed Smith" for his services connected to Reed Smith's billings.  (*Id.* at 3–4.)

## B.  The *Leviston* Action

On February 24, 2010, Lastonia Leviston filed a complaint against Jackson in New York state court, alleging he unlawfully posted a "sexually explicit

---

[3] Jackson incorporated the Retainer to his Amended Counterclaims as Exhibit H.  (*See* AP ECF 22-8 (Am. Obj. & Countercl. Ex. H, Retainer).)

videotape" depicting Leviston "without her knowledge or consent."[4] (AP ECF 22-4 (Am. Obj. & Countercl. Ex. D, Leviston Compl.) ¶ 1.) According to the Complaint, Leviston and Maurice Murray were in a romantic relationship and videotaped themselves "engaging in sexually explicit activities" on June 30, 2008. (*Id.* ¶¶ 4–6.) She intended the Video to be private and thereafter explicitly asked Murray to destroy it. (*Id.*) However, around March 1, 2009, Murray gave or sold the Video to Jackson without Leviston's knowledge or consent. (*Id.* ¶ 7.) Jackson then edited the Video; narrated and appeared in the edited version; published it; and then publicly described Leviston as a "call girl," "Brooke," and the mother of a child with his rival, William A. Robert II, also known as Rick Ross ("Rick Ross"). (*Id.* ¶¶ 7–13.) Leviston asserted three counts— (1) violation of sections 50–51 of the New York Civil Rights Law, (2) IIED, and (3) defamation—and sought compensatory, special and punitive damages. (*Id.* ¶ 1.)

Jackson alleges that Appellees did not obtain certain discovery key to his defense. First, Appellees did not subpoena documents from NING Interactive Inc., the internet provider that hosted the website owned by Rick Ross where the Video was allegedly first published ("Internet Provider"). (*Id.* ¶ 16.) Second, Appellees did not interview or depose Rick Ross, Murray or the Internet Provider (collectively, "Three Uncalled Witnesses"). (*Id.* ¶¶ 17, 61.) Instead, on February 22, 2012, Appellees entered into a binding stipulation agreement with Leviston's counsel in which they agreed not to call any witness to testify who had not previously been

---

[4] Jackson incorporated the Leviston Complaint to his Amended Counterclaims as Exhibit D. (*Id.*)

disclosed and deposed.[5]  (*Id.* at ¶¶ 17, 63; AP ECF 22-6 (Am. Obj. & Countercl. Ex. F, Stip.) ¶¶ 8–10.)  Because Appellees never identified any of the Three Uncalled Witnesses, he was not permitted to call them to testify.  (*Id.* ¶ 68.)  Jackson alleges that these witnesses were "material, relevant, and critical" to his defense concerning liability and damages.  (*See id.* ¶¶ 85,93, 101.)

On March 27, 2015, Jackson terminated Appellees. (*See id.* ¶ 108.)  According to Jackson, Appellees "represented that they would cooperate with and provide all the material, documentation, and information to Jackson's new counsel, Bickel & Brewer, but failed and refused to cooperate with new trial counsel, which was to the detriment and prejudice of Jackson and caused him to be subject to an unfavorable jury verdict."  (*Id.* ¶ 20.)  Replacement counsel sought to reopen discovery to depose the key witnesses, but the court denied the request.  (*See id.* ¶ 103.)  Trial commenced, concluded, and the jury awarded actual and punitive damages in the sum of $7,000,000.  (*Id.* ¶ 21.)

### C. Chapter 11 Bankruptcy Proceedings

On July 13, 2015, Jackson filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.  (*Id.* ¶ 1.)  Reed Smith filed its Proof of Claim on November 3, 2015, claiming Jackson owes the firm $609,235.41.  (*See* AP ECF 22-1 (Am. Obj. & Countercl. Ex. A, Proof of Claim).)  Jackson lodged objections on October 18, 2016.  (AP ECF 22 ¶ 2.)

---

[5] Jackson incorporated the Stipulation to his Amended Counterclaims as Exhibit F.  (*Id.*)

### 1. *The Pleadings*

On January 27, 2017, Jackson initiated an adversary proceeding against Appellees, (*see* AP ECF 1 ¶¶ 2, 30–32). Appellees moved to dismiss Jackson's Counterclaims on April 17, 2017.  (See AP ECF 16 (Mot. Dismiss).)   On May 22, 2017, Jackson timely filed Amended Counterclaims, which constitute the operative pleading in this case.[6]  (*See* AP ECF 22.)

There are five Amended Counterclaims with the following titles: (1) "first cause of action for malpractice, breaching a fiduciary duty in having an unwaivable conflict of interest and failing to exercise due diligence in representing Jackson;" (2) "second cause of action for breaching a fiduciary duty and malpractice in failing to conduct reasonably competent pre-trial investigation and discovery of key material witnesses and engaging in other conduct prejudicial to Jackson's defense;" (3) "third cause of action for breach of fiduciary duty and malpractice by charging excessive legal fees;" (4) "fourth cause of action for breach of fiduciary duty and malpractice for pursuing litigation on a matter for which [Appellees] believed Jackson did not have a viable defense for and failing to engage in meaningful settlement negotiations to seek expedited resolution of the matter;" and (5) "fifth cause of action for breach of fiduciary duty and malpractice in failing to develop a reasonably competent defense to Leviston's claims against Jackson made pursuant to New York Civil Rights Law Sections 50 & 51 and Intentional Infliction of Emotional Distress."  (*Id.* at Causes of Action.)  In summary, each count

---

[6] Rule 15 of the Federal Rules of Civil Procedure govern Jackson's amended pleading.  *See* Fed. R. Bankr. P. 7015.  While normally Rule 15 only gives the plaintiff 21 days to respond to a motion to dismiss, the parties agreed to a response deadline of May 22, 2017. *See* Fed. R. Civ. P. 15(a)(1)(B).  (*See also* AP ECF 19 (Order re Stip.).)

asserts a legal malpractice claim and a breach of fiduciary duty claim for a specific set of facts.

Appellees filed its second Motion to Dismiss the adversary proceeding on June 19, 2017.  (*See* AP ECF 27 (Mot. Dismiss).)  The bankruptcy judge held a hearing on May 23, 2018 and ordered supplemental briefing.  (See AP ECF 48 (Audio File).)  The motion was fully briefed by June 28, 2018.  (See AP ECF 59 (2d Supp. Br.).)

On March 1, 2019, the bankruptcy court issued its decision on the motion to dismiss. (AP ECF 62 (Dec. on Mot. Dismiss).)  At the outset, the bankruptcy court dismissed all breach of fiduciary duty claims that arose from Appellees' representation of Jackson during the *Leviston* case, concluding that they were duplicative because they were based on the same facts and alleged the same damages.  (*Id.* at 16–17.)  The only breach of fiduciary claim the bankruptcy court did not dismiss as duplicative was part of Count 2—Appellees' failure to cooperate with replacement counsel—on the grounds the alleged breach arose <u>after</u> Jackson terminated Appellees.  (*Id.* at 17.)  The bankruptcy court nonetheless dismissed the Count 2 breach of fiduciary duty claim for failure to allege causation between the alleged breach and damages.  (*Id.* at 26.)

As for the legal malpractice claims, the Court dismissed nearly all of them for failure to state a claim except one narrow issue: as to Count 2, whether Appellees' failure to conduct discovery and preserve the testimony of three witnesses "may have mitigated the amount of damages" awarded against Jackson in the *Leviston* case.  (*See* AP ECF 62 at 24.)

7

### 2. *Relevant Evidence*

The following evidence relates to the summary judgment issues on appeal.

### i.  Appellees' Litigation Strategy

On January 24, 2011, Raymond e-mailed Sedlmayr and CC'd Nikki Martin, Vice President of CJJ Enterprises, LLC's (Jackson's company), and Evan Farber, an associate at Reed Smith.   Raymond summarized information Jackson and Martin told him, which was that Rick Ross acquired the Video and posted it on his own site, that Jackson streamed the Video but did not post it, and that "no advertising was sold through use of the video."  (AP ECF 335-32 (Summ. J. Opp'n Ex. 31, Email 1/24/11).)  Raymond added, "If we can prove that Rick Ross was the uploader of the video onto the Internet, I think this will take a good deal of sting out of the claims against 50."  (*Id.*)

The record contains a draft subpoena.  The first is directed to Rick Ross, dated "April __ 2011."  (AP ECF 335-34 (Summ. J. Opp'n Ex. 33, Draft Subpoena Ross).)  The draft includes a Schedule A listing all documents Rick Ross would be required to bring to the deposition.  (*See id.*)  The second is directed to Murray, dated "October __, 2011," and similarly requests documents.  (AP ECF 335-46 (Summ. J. Opp'n Ex. 45, Draft Subpoena Murray).)

On February 22, 2012, the parties entered into a discovery stipulation that the trial court adopted ("2012 Stipulation").  Paragraph 12 states:

> Defendant shall inform Plaintiff by May 1, 2012 if he intends to call any witnesses at trial other than those Plaintiff has already deposed or will depose pursuant to this Order.   Defendant shall produce all documents related to such witnesses' testimony on or before May 1, 2012.   Plaintiff shall complete all depositions of any such witnesses on or before June 15, 2012.

8

(AP ECF 22-6 ¶ 10.)  Farber testified that he informed Martin about the plan to enter into the 2012 Stipulation.  (ECF 24-10 (Appeal Br. App. 10, A-2291–2571) at A-2369.)  Jackson confirmed he was not part of discussions about witnesses.  (*Id.* at A-2356.)

Fast forward through the close of discovery to trial preparation.  On December 31, 2014, Craig Weiner emailed Farber, CC'ing Steve Savva, about the 2012 Stipulation.  (AP ECF 335-50 (Summ. J. Opp'n Ex. 49, Email 12/31/14).)  Weiner stated: "Also please send me the stipulation regarding witnesses at trial as well as any contemporaneous correspondence with the client and/or the other side. I need to explain this surprise developement [sic] with the client. I must say I wish this was brought to our attention when we first spoke with Peter as if we can't call the witness it means we may have spent a lot of time and money for naught.  Is there anything else I need to be aware of?"  (*Id.*)

Later that day, Farber emailed Raymond summarizing a call he had with Weiner, Savva, and the private investigator who had tracked down Murray in prison.  (*See* AP ECF 335-48 (Summ. J. Opp'n Ex. 47, Email 1/1/15).)  He informed Raymond that he "warned them about our stipulation against calling new witnesses" after they expressed interest in finding witnesses who could testify about Leviston's past.  (*Id.*)  Farber reflected: "This was news to them (though I told them we had previously told that to 50 and Nikki) and they asked that I forward the stipulation to them."  (*Id.*)

On January 4, 2015, Farber emailed the case team about discovery in their e-folder.  (*See* AP ECF 335-36 (Summ. J. Opp'n Ex. 35, Email 1/4/15).)  He referenced

an e-mail with a link to a video in which Rick Ross "takes credit for 'This Is Sabrina's Sin' being his website." (*Id.*)

On January 12, 2015, Martin e-mailed Raymond and Farber about "the investigator's conversation with Murray and his brother." (AP ECF 335–44 (Summ. J. Opp'n Ex. 43, Email 1/12/15).) She asked counsel whether they could "ask for more time" and whether "the calls need to be subpoenaed." (*Id.*) Martin added, "I have to say 50 was pretty disappointed to hear that all the while we were told Murray could not be found, Steve found him with a google search. I really hope we can come up with the most positive outcome possible in this matter." (*Id.*)

A few weeks later, Sarah Levitan, a Reed Smith associate, e-mailed Raymond her suggestions for his opening statement. (AP ECF 335-37 (Summ. J. Opp'n Ex. 36, Email 1/20/15).) She reflected: "My only other thought would be to further emphasize the role both Murray and Ross played and their general poor character. This may help jurors who aren't as comfortable blaming Ms. Leviston for the release of the tape blame someone else rather than 50." (*Id.*)

On March 12, 2015, Farber e-mailed the case team about "a few thought questions … for which I haven't been able to come up with great responses." (AP ECF 335-33 (Summ. J. Opp'n Ex. 32, Email 3/12/15).) He references belated production from the plaintiff, stating: "They say that we're not prejudiced by the belated production, and if we are, they'll work with us on reasonable discovery to ameliorate the prejudice. How do we respond to that? And if the Judge asks, what discovery do we think we need? A dep of Rick Ross, to be sure, but what else?"

(*Id.*)  Raymond responds, "A Ross depo would be great now and would solve all the problems."  (*Id.*)  He added, "But don't know if we can get Ross."  (*Id.*)

By the end of the month, Jackson terminated Appellees.  (ECF 24.2 (Appeal Br. App. 2,  A-243-480) at 306–07.)

### ii.  Replacement Counsel

On May 1, 2015, replacement counsel—Stephanie Gase, Paul Miletic, and Steven Losquadro of Bickel & Brewer—Reed Smith, and Leviston's counsel appeared before Judge Wooten due to replacement counsel's motions to postpone trial and to bring a third-party claim against Rick Ross.  (*See id.* A-302–07.)  With respect to the first motion, Attorney Gase explained that Bickel & Brewer was retained on March 27, requested the case file from Reed Smith "[s]hortly thereafter," received the initial documents on April 3, sent "a list of everything [they] thought was missing" on April 8, did not receive additional documents until April 21, and  determined they were "still missing a substantial number of files from Reed Smith."  (*Id.* at A-306–07)  Attorney Gase explained, "I've yet to be able to fully prepare without getting those files."  (*Id.* at A-307.)

As for the second motion, Attorney Gase explained that Bickel & Brewer wanted to seek discovery from Rick Ross, (*id.*) and add Ross as a "third party for contribution."[7]  After Judge Wooten explained that the case was filed in 2010, been through "tons of discovery," summary judgment motions, the note of issue stage, and then reflected a "third party action against Rick Ross … could have been concluded years ago," Attorney Gase responded the third party claim against Ross

---

[7] Page 7 of the transcript is missing from the record.

"is something that could have been at the beginning of this litigation and was not done." (*Id.* at A-308.) Judge Wooten denied Attorney Gase's request, expressing concern for preserving judicial economy and avoiding prejudice to Leviston. (*See id.* at A-309–10.)

Judge Wooten permitted Leviston's counsel to be heard on the issue of adjournment. Jackson's counsel described the process of replacing counsel from the plaintiff's vantage point. In summary, plaintiff's counsel expressed concern that Jackson's replacement of counsel only two months before trial may have been a "disingenuous" effort to prevent the trial from going forward. Jackson's counsel made several arguments. First, replacement counsel entered an appearance before receiving the file even though the trial date was set to begin in less than 60 days, and counsel believed no lawyer would accept a case shortly before trial without having the file. (*See id.* at A-312, 315–16.) Second, replacement counsel delayed bringing their trial issues before the court "up to 27 days from the time they were aware of a problem" despite being retained less than 60 days before trial was set to begin. (*Id.* at A-312, 315–16, 319–20.) Third, plaintiff's counsel believed Jackson may have an "ulterior motive" for discharging an attorney "who has represented them successfully for 14 years, and in this case aggressively and thoroughly and extremely competently" solely because of "high fees," when replacement counsel "has to start from ground zero and read the entire file" and Attorney Raymond offered to help get replacement counsel prepared. (*Id.* at A-312–13, 320–21.) Fourth, replacement counsel reason for requiring an adjournment shifted, including replacement counsel's daughter's graduation, Jackson's

schedule, and the missing documents. (*See id.* at A-318–19.)  Fifth, the outstanding documents appeared to be attorney work product, which counsel described as "the last thing I need … especially if Mr. Raymond has been fired… no disrespect…." (*Id.* at A-319.)

The court next addressed the missing files and Reed Smith's exercise of a retainer lien.  Attorney Gase stated that Jackson was "unhappy with [Raymond] from the size of the bills" but did not say the termination was "for cause."  (*Id.* at A-325–26, 339.)  Judge Wooten summarized Jackson's position on the retainer lien issue as <u>not</u> a challenge to the validity of the retainer lien, but as a request to find an exception "under the grounds of exigent circumstances."  (*Id.* at A-329–30.)

With respect to the documents that were turned over, Attorney Raymond stated:

> I have given them almost all the files.  In fact, I have given him everything that we had when we started preparing for trial last December.  They have all the pleadings, all the depositions, all the expert reports, all the documents produced by either side.  Lots of correspondence. All sorts of research.  They have all of that.  The only thing that we haven't given them, maybe a few miscellaneous things that fell through the cracks.  The only thing is our actual trial preparation work product.  Our proposed voir dire.  Our outlines for witness testimony and things like that in the state that they were at the time that we were dismissed.  So that's all.  Everything else they have to get ready for trial.

(*See id.* at A-331–32.)  He also stated, "[A]ll that we're asking the Court to do is to direct them to post a bond in the amount of our fees.  We will turn the files over to them."  (*Id.* at A-332.)  Attorney Raymond then requested a referral to binding arbitration or a special master to have a third party resolve whether the fees were reasonable.  (*See id.*)  After much discussion, the parties agreed, and the court ordered an appeal bond in an amount under seal and a referral to a special referee.

13

(*See id.* at A-335–37.)  When prompted for comments, new counsel did not offer any or otherwise object.  (*See id.* at A-340.)

Ultimately, Judge Wooten denied both motions.  With respect to replacement counsel's request for an adjournment, Judge Wooten described the painstaking process by which a trial date was chosen, including to accommodate Jackson's busy schedule in 2015.  (*See id.* at A-342–43.)  Judge Wooten added: "Notwithstanding that, the defendant chose to change counsel.  That was his choice.  And I pointed out that it's his choice because he did not discharge his current counsel for any particular reason or for cause but for a financial convenience.  That is not reason enough for us to change the trial date."  *Id.*  For replacement counsel's request to add a third-party action, the court denied the motion on the grounds that it could be pursued separately, including after trial.  (*See id.* at A-343.)

### iii. Discovery of Three Uncalled Witnesses

It is undisputed that neither Appellees nor replacement counsel ever obtained discovery from the Three Uncalled Witnesses during the *Leviston* case.  During the bankruptcy action, the parties obtained discovery from Rick Ross and the Internet Provider.  Based on the record, it does not appear Murray was deposed or provided documents.

Rick Ross signed an affidavit on April 13, 2020 and Jackson deposed him nine days later.  (*See* ECF 24-6 (Appeal Br. App. 6, A-1247-1504) at A-1387–95 (Rick Ross Depo. Excerpt); ECF 24-7 (Appeal Br. App. 7, A-1505–1774) at 1587–1629 (Rick Ross Dep. Excerpt); AP ECF 302-17 (Mot. Summ. J. Ex. 17, Ross Aff.).)  Rick Ross

stated that he became aware of the Video in 2009 during a radio interview with "Big Tigger."  (AP ECF 302-17 ¶ 9.)  In his deposition, he claimed that he did not address the Video directly but instead "redirect[ed] the conversation" to promote his latest album, Deeper Than Rap, "by suggesting that I would post the video on 'DeeperThanRap.com', a website I created to advertise my new release."  (*Id.*; ECF 24-6 at A-1606.)  He denied posting or authorizing anyone to post the Video on any website.  (*See id.* ¶ 10.)  He also denied ever possessing the Video.  (*See id.*)  When asked if he ever owned or controlled "ThisisSabrinasSin.Ning.com," Rick Ross did not recall.  (ECF 24-7 at A-1592, 1596–99 (Rick Ross Depo Excerpt); AP ECF 302-17 ¶ 16.)  With respect to Jackson's claims against Reed Smith, Rick Ross stated he would have refused to be interviewed by Jackson's lawyers and, if subpoenaed, would have testified that he never possessed or posted the Video.  (AP ECF 302-17 ¶¶ 13–14.)

Jackson served a subpoena duces tecum on the Internet Provider in 2019, requesting information from January 1 through April 30 of 2019.  (AP ECF 335-43 (Mot. Summ. J. Opp'n Ex. 43, NING Ltr.).)  The Internet Provider informed Jackson that the company had a policy of permanently deleting information when there is an outstanding balance lasting more than 60 days. (*See id.*)  The only information the Internet Provider retained was ThisisSabrinasSin.Ning.com's creation date of February 26, 2009 and deletion date of April 4, 2012.  (*See id.*)  The Internet Provider also stated that it had never been served with a subpoena.

While Jackson never deposed or obtained documents from Murray, he testified about their conversation concerning the Video.  Jackson testified that

Murray approached him about disseminating the Video and stated he hoped to get a book deal.  (AP ECF 335-3 (Summ. J. Opp'n Ex. 2, Jackson Dep.) at 10:23–11:25.)  With respect to Murray communicating Leviston's purported consent, Jackson testified, "And [Murray] was like, Nah, she don't care.  Like, let's just put it out there anyway and see if possibly we could do a book or something else after that comes from it."  (*Id.* at 11:21-25.)

### iv.  Jackson's Standard of Care Expert

Jackson retained Attorney Jonathan D. Lupkin as his expert on the attorney standard of care.   Attorney Lupkin is a practicing attorney with 26 years of experience, including litigating legal malpractice, professional liability, and IIED claims.  (AP ECF 335-29 (Summ. J. Opp'n Ex. 28, Lupkin Report) at 1.)  Attorney Lupkin stated four appendices were attached to the report: Appendix A, a list of pending litigation with which he is involved; Appendix B, a list of his presentations and seminars; Appendix C, a list of documents on which he relied in forming his opinions; and Appendix D, a Statement of Assumed Facts that he was provided.  These appendices were not filed on the docket.

### a.  Defense Strategy

Attorney Lupkin described Appellees' defense strategy as containing four principals.  First, "to defeat Ms. Leviston's claim for violations of §§ 50 and 51 of the New York Civil Rights Law, Reed Smith intended to argue that Mr. Jackson's use of Ms. Leviston's likeness was not for commercial purposes—an essential element of a claim under those statutes"—because BooBooTV did not provide Jackson advertising revenue.  (AP ECF 302-43 at 14.)   Second, "to defeat Ms.

Leviston's IIED claim and/or mitigate any award of damages, Reed Smith intended to argue that Mr. Jackson acted without a culpable state of mind." (*Id.*) Namely, Reed Smith would have Jackson testify that Murray told him Leviston consented to publishing the Video. (*See id.*) Third, "to mitigate Ms. Leviston's compensatory damages, Reed Smith intended to argue that she did not suffer substantial emotional trauma from the posting of the Video because she worked in the "sex trade" and was thus comfortable with-and would perhaps benefit from—that kind of exposure." (*Id.* at 14–15.) Fourth, "to deflect blame from Mr. Jackson in the hopes of reducing punitive damages, Reed Smith intended to argue that the impact on Ms. Leviston of Mr. Jackson's publishing of the Video was mitigated by Mr. Ross's earlier publication of the Video." (*Id.* at 15.) Reed Smith would elicit this testimony through Jackson and two of his employees who were involved in creating the Video and BooBooTV. (*See id.*)

### b.  Standard of Care

Attorney Lupkin stated New York Rule of Professional Conduct 1.3(a) sets the applicable standard of care—to "act with reasonable diligence and promptness in representing a client." He stated that "failure to investigate may fall below the standards of ordinary and reasonable skill." (AP ECF 302-43 at 16 (citing cases).)

### c.  Opinions

Attorney Lupkin concluded Appellees' failure to adequately pursue evidence from the Three Uncalled Witnesses fell below the standard of care. With respect to Ross and the Internet Provider, Attorney Lupkin stated he believed these witnesses would have had evidence relevant to Ross' control over the SabrinaSin website.

(AP ECF 302-43 at 22, 26.)   As for Murray, Attorney Lupkin opined that "relying solely on the self-serving testimony of a party witness is suboptimal" and that Murray's testimony would have lent credibility to Jackson.  (*Id.* at 29.)   He also expressed concern that Jackson's testimony would have been inadmissible hearsay and concluded, "nothing prevented Reed Smith from asking Mr. Murray what he would say before deciding whether to elicit his testimony."  (*Id.* at 30.)   In drawing these opinions, Attorney Lupkin discussed deposition testimony from Attorney Raymond, Attorney Farber, Singh, and Villemeur; subpoenas Reed Smith drafted but did not send; e-mail correspondence between Reed Smith attorneys; reflections from mock jurors who participated in a jury consultant's 2015 mock trial; and he cited additional evidence.  (*See id., generally.*)

### 3. *Summary Judgment*

Appellees moved for summary judgment on April 30, 2020.  (AP ECF 300 (Mot. Summ. J.).)  In relevant part, they argued they were not negligent as a matter of law for two reasons.  First, according to the common law "attorney judgment rule," they did not breach their duty of care because they chose a reasonable trial strategy, even though it was a strategy that Jackson did not prefer.  (*Id.* at 19–23.)  Second, assuming Appellees breached their duty, the record does not establish their breach proximately caused the adverse jury verdict or any other damages against Jackson.  (*See id.* at 23–32.)

Jackson opposed summary judgment on the grounds that both parties retained expert witnesses on the attorney standard of care and the jury should be able to determine the credibility of these witnesses.   Jackson argued that

18

Appellees' strategy was not entitled to the "attorney judgment rule" because it was uninformed, lacked reasonable diligence, and may have been influenced by a conflict of interest.

The bankruptcy court made two findings of fact relevant to this appeal. First, the court deemed several 56(a) statements admitted on the grounds that Jackson failed to deny a fact or submit contradictory evidence; rather, he asserted supplementary information.[8] (AP ECF 395 at 8–9.) Second, the bankruptcy found Jackson's expert witness on legal malpractice, Attorney Lupkin, failed to include appendices C and D in his report, which meant the facts underlying the expert's opinion were unknown. (*Id.* at 28.)

The bankruptcy court made the following conclusions of law relevant to this appeal. First, the court did not accept Attorney Lupkin's opinion on three grounds: (1) that he based his conclusion—that Appellees should have asked informal questions of potential witnesses even if it is unclear the questions will lead to relevant information—on speculation and misapplication of the discovery standard; (2) that the report omitted the statement of assumed facts; and (3) that he misapplied the standard of care and placed an overly-burdensome duty on Appellees. (*See id.* at 48.) Second, the court evaluated relevant evidence and concluded Appellees did not breach their duty as a matter of law, because their decisions were protected by the attorney judgment rule. (*See id.* at 44–54.) Third, the court found Jackson's retention of new counsel and that counsel's decision to change the trial strategy broke the chain of causation. (*See id.* at 54–56.)

---

[8] Specifically, the paragraphs deemed admitted are 13 through 20, 22, 55, 56 and 59. (*See id.* at 9.)

The bankruptcy court then granted summary judgment in Appellees' favor on the remaining Count 2 legal malpractice claim.

## II.     LEGAL STANDARD

The district court has jurisdiction to hear an appeal from final judgments, orders, and decrees of the bankruptcy court pursuant to section 158(a)(1) of Title 28 of the United States Code.   A district court reviewing the decision of a bankruptcy court is to review "the bankruptcy court's factual findings for clear error and its legal conclusions *de novo*."  *In re Motors Liquidation Co.*, 957 F.3d 357, 360 (2d Cir. 2020); *In re Caires*, 624 B.R. 322, 327 (D. Conn. 2021) (same).  "The district court may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree, or remand with instructions for further proceedings." *In re Martin*, No. 3:20-CV-939 (SRU), 2020 WL 5300932, at *1 (D. Conn. Sept. 4, 2020) (internal quotation marks omitted).

## III.     DISCUSSION

In this appeal, Jackson argues the bankruptcy court made six reversible errors, four in its motion to dismiss decision and two in its motion for summary judgment decision.  According to Jackson, the four motion to dismiss errors are: (1) the court concluded all but one of the breach of the fiduciary duty claims were duplicative of the corresponding malpractice claims when in fact the claim based on excessive billing was not duplicative; (2) the court incorrectly found that Jackson did not properly plead a legal malpractice claim (or a breach of fiduciary duty claim) based on an unwaivable conflict of interest, because he failed to plead facts establishing proximate cause; (3) the court found Jackson did not plead a

plausible malpractice claim concerning Appellees' failure to preserve discovery as to liability even though the court failed to assess the discovery relevant to IIED liability; and (4) the court incorrectly found Jackson failed to allege Appellees' failure to preserve discovery was a "but for" cause of his loss at trial.  The two summary judgment errors are: (1) the court engaged in "impermissible fact finding" and failed to construe the evidence in a light most favorable to Jackson; and (2) the court misconstrued New York law in assessing breach and causation. Appellees dispute each argument.

### A.    Motion to Dismiss: Duplicative Claims

Jackson argues the bankruptcy court improperly dismissed nearly all breach of fiduciary duty claims as duplicative of the legal malpractice claims.  He generally posits the court "erred as a matter of law because Jackson alleged plausible breach of fiduciary duty claims he was entitled to explore in discovery," yet only specifically challenges the bankruptcy court's duplicative ruling as to Count 3, the excessive billing claim.

Jurisprudence in the State of New York is clear: a breach of fiduciary duty claim is "redundant and should be dismissed" when it is "premised on the same facts and seeking the identical relief sought in the legal malpractice cause of action." *Weil, Gotschal & Manges, LLP v. Fashion Boutique of Short Hills, Inc.*, 10 A.D.3d 267, 271 (N.Y. App. Div. 1st Dep't 2004); *see Nordwind v. Rowland*, 584 F.3d 420, 432−33 (2d Cir. 2009) (explaining that breach of fiduciary duty claims must be dismissed as duplicative of legal malpractice unless the relief sought is restitutionary, in which case the lower "substantial factor" causation standard

applies).  It is appropriate to dismiss these types of duplicative claims at the motion to dismiss stage.  *See Mackey Reed Elec., Inc. v. Morrone & Assocs., P.C.*, 125 A.D.3d 822, 823 (N.Y. App. Div. 2d Dep't 2015) (affirming trial court's dismissal of breach of fiduciary duty and fraud claims as duplicative of the legal malpractice cause of action at the motion to dismiss stage "since they arise from the same facts as those underlying the legal malpractice cause of action, and do not allege distinct damages").

After evaluating this well-established principle, the Court finds that the bankruptcy court correctly dismissed all breach of fiduciary duty claims concerning allegations during the attorney-client relationship as duplicative of the legal malpractice claims.  Perhaps the best indicator that the claims are duplicative is the structure of the counts themselves.  That is, Jackson alleges five separate counts based on five sets of facts.[9] For each count, Jackson alleges the facts constitute legal malpractice <u>and</u> breach of fiduciary duty.  Jackson also alleges actual damages of $7 million and punitive damages of $25 million but does not indicate any claim warrants a different type of relief from another.  *See id.*  Simply

---

[9] The five counts are: (1) the retainer agreement compensated Attorney Sedlmayr as co-counsel, but he had an unwaivable conflict of interest due to his simultaneous representation of Rick Ross (Count 1); (2) Appellees failed to obtain pre-trial discovery—including testimony from the Three Uncalled Witnesses—and intentionally misrepresented information to Jackson about same, entered into a pre-trial stipulation that precluded trial testimony from any witness not previously identified, failed to disclose the stipulation to Jackson, and failed to cooperate with replacement counsel (Count 2); (3) Appellees charged excessive fees, failed to notify Jackson of increased billing rates, misrepresented to Jackson that they would cooperate with replacement counsel and provide all documents (Count 3); (4) as indicated in the Motion to Dismiss Jackson's Counterclaims, Appellees did not believe Jackson had a defensible case yet engaged in protracted litigation to maximize their fees (Count 4); (5) Appellees failed to develop a reasonably competent defense of Leviston's claims for violations under §§ 50 and 51 of New York Civil Rights Law and for IIED (Count 5).

put, the Amended Counterclaims are proof positive that the breach of fiduciary duty and malpractice claims are duplicative.

To the extent Jackson believes the breach of fiduciary duty claim is not duplicative of the legal malpractice claim for excessive billing, he is wrong. Jackson cites *Johnson v. Proskauer Rose LLP*, 129 A.D.3d 59, 70 (N.Y. App. Div. 1st Dep't 2015) for the proposition that, unlike legal malpractice, a breach of fiduciary duty claim based on excessive fees can be "stated regardless of the quality of the work performed." Jackson takes this case out of context. In *Johnson*, the legal malpractice claim was premised on the poor advice in the attorney's opinion letter, whereas the breach of fiduciary duty claim was based on the large fee given that "Proskauer had issued approximately 380 other opinion letters confirming the legality of the tax avoidance plan, and that the fee appeared to be a disguised finder's fee, or commission." *Id.* at 66. In denying the motion to dismiss the breach of fiduciary duty claim, the court observed that the allegations were "distinct from the legal practice claim inasmuch as it did not relate to the quality or content of defendants' legal advice to the plaintiff." *Id.* Accordingly, the facts alleged for each type of claim were distinct, and therefore not duplicative.

Jackson cites three other cases in which the appellate court affirmed a denial of a motion to dismiss breach of fiduciary duty claim concerning excessive fees. As with *Proskauer*, in each of these cases where the plaintiff alleged both malpractice and breach of fiduciary duty, the underlying allegations were different. First, the legal malpractice claim in *Sobel v. Ansanelli*, 98 A.D.3d 1020, 1022−23 (N.Y. App. Div. 2d Dep't 2012) was based on the defendant's failure to protect the

23

value of estate assets whereas the breach of fiduciary duty claim was based on excessive billing for services to the decedent.  Second, in *Cascardo v. Dratel*, 171 A.D.3d 561, 562 (N.Y. App. Div. 1st Dep't 2019), the plaintiff alleged her $25,000 fee "bore no rational relationship to the product delivered," which was a draft complaint identical to the one she gave them—the court distinguished between the "overbilling" facts associated with the breach of fiduciary duty and the "quality of the work."  *Id.*  The third case, *Loria v. Cerniglia*, 69 A.D.3d 583 (N.Y. App. Div. 2d Dep't 2010) is a mere four paragraphs long and contains no analysis as to why the legal malpractice and excessive fee charge are not duplicative.  Thus, Jackson's cases do not support a finding that the bankruptcy court erred in dismissing the duplicative claims.  Accordingly, on *de novo* review, the Court AFFIRMS the bankruptcy court's dismissal of breach of fiduciary duty claims alleged as Count 1, part of Count 2, and Counts 3 through 5.

> ### B.   <u>Motion to Dismiss: Malpractice for Unwaivable Conflict of Interest</u>

The bankruptcy court dismissed Jackson's legal malpractice claim under Count 1 on the grounds that Jackson failed to allege how the purported "unwaivable conflict of interest" proximately caused damages.  (*See* AP ECF 62 at 18–19.)  The court presumed as true that Appellees' work with and payment to Attorney Sedlmayr, who was also retained by Rick Ross, was an "unwaivable conflict of interest" and that the conduct violated section 1215.1 of Title 22 of the New York Administrative Code.   Nonetheless, the court ruled Jackson's "conclusory statements"—that Appellees' conduct was "prejudicial" and "caused damages"—were insufficient under the pleading standard.   (*Id.*)   The court

observed that "the allegation fails to address how the Appellees' conduct was prejudicial, and, how Mr. Jackson would have obtained a more advantageous result in the Leviston Case but for the prejudicial conduct." (*Id.* at 19.)

Jackson argues that the bankruptcy court erred because an ethical violation like a conflict of interest can be evidence of legal malpractice and his allegations could plausibly be interpreted as establishing proximate causation.  According to the Amended Counterclaims, Attorney Sedlmayr—Jackson's attorney who worked with and received fees from Reed Smith as part of the Retainer Agreement—also represented Rick Ross, one of the "key material witnesses."  (*Id.* ¶¶ 41–54.) Jackson also alleges that Appellees "intentionally made misrepresentations to Jackson" by failing to disclose they entered a stipulation not to take depositions of the key witnesses and precluding them from being called as witnesses at trial. (*Id.*¶ 4.)  According to Jackson, Appellees' decision to enter into a stipulation "precluded Jackson from calling as key material witnesses Ross, Murray and the Internet Provider as defense witnesses."  (*Id.* ¶ 69.)  After chronicling Appellees' failures—which include their failure to take discovery and decision to enter the stipulation—and explaining he was forced to retain new counsel, Jackson alleges: "As a result, Jackson could not establish his meritorious defenses to the allegations of Leviston in the case against him.  This conduct resulted in a verdict against Jackson in an approximate sum of $7,000,000 consisting of both actual damages and punitive damages in addition to legal interest."  (*Id.* ¶ 21.)

Appellees disagree.  They argue that a "stand-alone cause of action for a conflict of interest" is not actionable; that, in any event, Jackson pursued the

conflict of interest in discovery; and that evidence demonstrated Ross would not have testified as the Amended Counterclaims suggests.  (ECF 27 at 41–42.)

An attorney is only liable for a conflict of interest "where the client can show that he or she suffered actual damage as a result of the conflict."  *Tabner v. Drake*, 780 N.Y.S.2d 85, 89 (3d Dep't 2004) (citations omitted).  "In general, to establish proximate cause, or 'but for,' causation in an action for attorney malpractice, a plaintiff must plausibly allege that, but for the malpractice, the plaintiff would have received a more advantageous result, would have prevailed in the underlying action, or would not have sustained some actual and ascertainable damage."  *Prout v. Vladeck*, 316 F. Supp. 3d 784, 799 (S.D.N.Y. 2018) (citing *Schwartz v. Olshan Grundman Frome & Rosenzweig*, 302 A.D.2d 193, 198 (N.Y. App. Div. 1st Dep't 2003)).

The Court agrees with the bankruptcy court that Jackson failed to allege facts sufficient to establish proximate cause.  As the bankruptcy court correctly determined, Jackson's causation allegations are nothing more than mere legal conclusions: that Appellees' conflict "was prejudicial to the defense" and that it "caused Jackson to incur substantial damages."  (AP ECF 22 ¶¶ 44, 52–54.)  While courts are required to accept all factual allegations as true on a Rule 12(b)(6) motion, the same does not apply for legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  As the Supreme Court explained in *Iqbal*, Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Id.* at 678–79.  Put another way, "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."

*Id.*   Words like "prejudicial," "caused," and "substantial damages," without more, are perfect examples of "threadbare recitals of the elements of a cause of action" that lack factual support.

After assessing federal and state cases addressing the causation element of legal malpractice claims, the Court finds several state cases instructive.[10]  First, compare Jackson's allegations to those of *Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*, 56 A.D.3d 1, 8 (N.Y. App. Div. 1st Dep't 2008).  There, the New York appellate court ruled that a plaintiff insurance company pleaded a viable malpractice claim because the "complaint asserts that, as a result of defendant's divided loyalties [to another insurance company], the law firm's professional judgment was impaired, causing it to recommend that [plaintiff] provide coverage despite the expiration of its policies prior to the date on which the claims were filed."  *Id.*   Unlike the *Ulico* plaintiff, Jackson merely describes the dual representation as an "unwaivable conflict of interest" but does not allege that counsel's loyalties were divided, let alone any other facts indicating that the alleged conflict caused his loss at trial.

Second, consider *Sitar v. Sitar*, 50 A.D.3d 667, 669 (N.Y. App. Div. 2d Dep't 2008).  In affirming the pleadings adequately alleged proximate cause, the appellate court observed the *Sitar* plaintiffs alleged counsel "represented both sides of the

---

[10] The Court notes that New York's corollary to Federal Rule 12(b)(6) is New York Civil Practice Law and Rules § 3211(a)(7), which permits a party to move for dismissal if "the pleading fails to state a cause of action."  As the Rule's commentary points out that, post-*Twombly/Iqbal*, CPLR 3211(a)(7)'s pleading standard is lower than Rule 12(b)(6).  *See* CPLR § 3211, ed. note cmt. ¶ 7 ("[I]n the wake of *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007), a federal pleading is subject to greater scrutiny on a rule 12(b)(6) motion than a New York State court pleading encounters on a CPLR 3211(a)(7) motion.").

transaction, and was thereby burdened by a conflict of interest, and that he was aware of information critical to the [transaction] but withheld that information…." *Id.* at 669–70.   Here, Jackson's allegations do not specify the nature of the supposed conflict, why counsel would have chosen not to do discovery because of the conflict, and why that choice led to a jury verdict against their client.

In contrast, Jackson's situation is similar to *Bua v. Purcell and Ingrao, P.C.*, 99 A.D.3d 843 (N.Y. App. Div. 2d Dep't 2012).   In *Bua*, the New York appellate court affirmed a legal malpractice dismissal where the plaintiff, the seller of a property, alleged the defendant lawyer failed to properly cancel a contract for sale when the buyer did not have sufficient funds to finance the sale.   The buyer sued the plaintiff for specific performance; thereafter, the plaintiff sued the lawyer alleging damages in the form of "expenses incurred in connection with the action for specific performance, potential profits that were not realized because of the effect of the notice of pendency, and costs and lost profits incurred by virtue of the buyer's refusal to vacate the property."   *Id.* at 848.   In affirming the dismissal, the appellate court reasoned the plaintiff's argument was based on several layers of speculation:

> The crux of the plaintiff's contention is that the buyer would not have chosen to commence the action for specific performance and would have voluntarily vacated the premises if the defendants had taken the additional enumerated steps to accomplish the termination of contract of sale. The plaintiff's contention rests on speculation as to how the buyer would have responded to these requests. In addition, the damages cited by the plaintiff all stem from the buyer's independent decision to remain on the premises and commence the action for specific performance. It again requires speculation to conclude that the buyer would have refrained from taking these actions if the additional steps were attempted. Accordingly, the plaintiff's contention that the alleged malpractice resulted in legally cognizable damages is conclusory and speculative inasmuch as it is

premised on decisions that were within the sole discretion of the buyer.

*Id.*  Like the *Bua* plaintiff, Jackson relies on speculation to establish causation. That is, Jackson speculates the conflict of interest caused counsel not to conduct discovery.  As the appellate court aptly put it, "Conclusory allegations of damages or injuries predicated on speculation cannot suffice for a malpractice action and dismissal is warranted where the allegations in the complaint are merely conclusory and speculative."  *Id.* at 848 (internal citations omitted); *see also Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level…").  Jackson's pleadings fall short just as the *Bua* plaintiff's did.

As these cases illustrate, without more, the Court cannot conclude the conflict of interest impacted counsel's discovery strategy, or that the conflict caused Jackson to lose at trial.  The Court rejects Jackson's argument that a "plausible inference can be drawn" from the Amended Complaint that Appellees did not depose Ross because of Attorney Sedlmayr's dual representation.  (*See* ECF 24 (Appeal Br.) at 24.)  To draw this conclusion, the Court would be called on to read between the lines—i.e., speculate as to Appellees' motive for their discovery strategy.  The Court will do no such thing.  Accordingly, after conducting a *de novo* review, the bankruptcy court's dismissal of Count 1's legal malpractice claim is AFFIRMED.

  **C.**  <u>Motion to Dismiss: Malpractice for Failure to Conduct Discovery</u>

Next, Jackson appeals the bankruptcy court's dismissal of his second claim for legal malpractice based on Appellees' failure to obtain discovery from the Three

Uncalled Witnesses.  Based on Jackson's allegations that Appellees' failure to conduct discovery impacted his case at "liability and damages," (*see, e.g.,* AP ECF 22 ¶ 61), the bankruptcy court assessed the alleged legal malpractice in Count 2 with respect to these two different trial stages.   In addressing causation, the bankruptcy court evaluated whether Jackson's description of the supposed discovery could have defeated his liability for Leviston's first count (New York Civil Rights Law §§ 50 and 51) but not her second count (IIED).  The bankruptcy court held that Jackson "fails to adequately plead a viable legal malpractice claim as to the jury's ultimate liability determination" but that he "sufficiently pled that but for the Appellees' negligence, the damages he suffered may have been mitigated or absolved."  (AP ECF 62 at 23.)  In other words, Jackson failed to allege as a matter of law that he would have won but for Appellees' failure to conduct the discovery at issue, but he did sufficiently allege that—had Appellees <u>not</u> failed to conduct discovery—his damages may have been mitigated or absolved.

Jackson contends the bankruptcy court erred by failing to assess liability concerning Leviston's IIED claim (and focusing solely on the New York Civil Rights claim).  (ECF 24 at 25.)  Appellees challenge Jackson's argument with evidence from the *Leviston* trial.  (*See* ECF 27 (Appeal Opp'n) at 43.)

It is true the bankruptcy court never discussed the witnesses' anticipated testimony in the context of the IIED claim.  The bankruptcy court found that both Rick Ross' and the Internet Provider's alleged anticipated testimony establishing Rick Ross posted the Video first was irrelevant, because the central element of the New York Civil Rights Law claim was not about who posted the Video first but

whether Jackson had "written consent" to post. (*See* AP ECF 62 at 21–22.)  The bankruptcy court also noted, with respect to the Internet Provider testimony only, that the order of who posted the Video was not relevant to an IIED claim either. (*See id.*)    As for Murray, the Court found that the allegations in which Murray represented to Jackson that both he and Leviston gave Jackson permission to distribute the Video similarly failed to establish New York Civil Rights Law's "written consent" requirement.  (*See id.*)

While the bankruptcy court did not make this assessment, after conducting a *de novo* review, the Court finds the result should be the same.  The elements of an IIED claim require a plaintiff to allege "four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress."  *Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 121 (1993).  Jackson alleges that Murray "represented to Jackson that the video was given with Murray's and Leviston's permission and authority to distribute the video."  (*See* AP ECF 22 ¶ 73).  He does not allege that Leviston personally gave him permission.

His failure to obtain consent directly from Leviston is akin to the defendant in *Doe v. Doe*, 2017 WL 3025885, at *6 (S.D.N.Y. July 14, 2017).  There, the defendant discussed making a sex tape with the plaintiff and "did not 'recall or believe she ever refused the idea.'" *Id.* (citing John Aff. ¶ 9.)  The court reasoned, "His belief, even if in good faith, is irrelevant insofar as he admits that he never expressly asked Plaintiff for her consent to be filmed on the date he created the recording at

issue, and indeed admits that he never received it." *Id.* Absent the intent to cause harm, the court concluded videotaping without consent and posting the recording on a public website establishes "disregard of a substantial probability of causing, severe emotional distress." *See id.* (citing *Howell*, 81 N.Y.2d at 121). For such a personal and sensitive subject matter, the Court finds that Jackson's reliance on Murray giving permission on behalf of his ex-girlfriend constitutes "disregard of a substantial probability of causing, severe emotional distress." *Howell*, 81 N.Y.2d at 121. Furthermore, Jackson acknowledges the *Leviston* complaint alleged he "superimposed his voice on the video" (*see* AP ECF 22 ¶ 14), yet he does not deny this allegation, nor does he allege he had permission to edit the Video.

Indeed, the Amended Counterclaims contain no facts that would enable the Court to conclude Murray was Leviston's agent or had a relationship with her that would give him authority to consent on her behalf. *See* Restatement (Second) on Agency § 1 (Agency; Principal Agent) (1958) ("The relation of agency is created as the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act."). Put another way, Jackson may have received authority from Murray, meaning he could have a viable defense if <u>Murray</u> brought the IIED claim. But it was not Murray who sued him, it was Leviston. And she did not consent Jackson publishing the Video. Rick Ross' publication (whether he published first or not at all) is irrelevant to Jackson's own "extreme and outrageous" conduct given these circumstances. In other words, Jackson's decision to project one person's consent onto another, given the highly personal subject matter and the context in which he made his

decision, satisfies all four elements of an IIED claim.  Accordingly, the Court AFFIRMS the bankruptcy court's ruling to dismiss Count 2 on all grounds except mitigation.

**D.**     **Motion to Dismiss: Breach of Fiduciary Duty for Failure to Cooperate with Replacement Counsel**

The bankruptcy court dismissed Jackson's breach of fiduciary duty claim for failure to cooperate with replacement counsel on the grounds that he failed to meet the plausibility standard articulated by *Twombly* and *Iqbal*.  (Mot. Dismiss Dec. at 26.)  In so ruling, The bankruptcy court posed the following questions: "But, in what way did the Appellees fail to cooperate with Replacement Counsel? Did they withhold information or provide inaccurate or incomplete information? How did the failure to cooperate, 'result[] in severe prejudice' or 'ultimately caus[e] a verdict to be entered' against the plaintiff?"  Characterizing the Amended Counterclaims as containing merely "formulaic recitations devoid of further factual enhancements," (*id.* (citing *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557), the bankruptcy court dismissed this count.

Rather than pointing to allegations in the Amended Counterclaims and citing case law to prove the allegations satisfied the *Twombly/Iqbal* standard, Jackson instead argues The bankruptcy court could have and should have relied on information in the "public record."  Namely, Jackson pointed out that Appellees' motion to dismiss included as an exhibit a transcript from an order to show cause hearing in the *Leviston* case, which he argues answers The bankruptcy court's questions.  During that hearing, Jackson's counsel explained to the trial court that Appellees were asked to send the case file on March 27, sent initial documents on

April 3, were notified of missing documents on April 8, and still failed to send all missing documents, which impeded replacement counsel's ability to prepare for trial. (*See* ECF 24 at 30.) Jackson described the "material detriment to his defense" as his replacement counsel not being able to review the complete file "spanning more than five years" just weeks before a multi-million-dollar jury trial. (*Id.* at 31.)

Appellees contend that these statements are missing from and do not cure the Amended Counterclaims. (*See* ECF 27 (Response) at 46.) According to Appellees, the trial judge recognized counsel turned over all files except their work product, properly withheld work product due to a valid attorneys' lien and permitted Jackson to obtain the withheld documents by posting a bond. (*Id.* at 46−47.)

This Court agrees with the bankruptcy court and finds Jackson's claim does not pass the plausibility standard. Within the 136-paragraph pleadings, only one sentence is dedicated to Appellees' failure to cooperate: "Raymond and Reed Smith represented that they would <u>cooperate with</u> and <u>provide all the material, documentation, and information</u> to Jackson's new counsel, Bickel & Brewer, but <u>failed and refused to cooperate</u> with new trial counsel, which was to the detriment and prejudice of Jackson and caused him to be subject to an unfavorable jury verdict." (AP ECF 22 ¶ 20 (emphasis added).) As the bankruptcy court points out, there are no factual allegations about Appellees' failure to cooperate. The structure of the sentence leaves the question open as to whether Appellees even failed to provide documents or merely failed to cooperate in other ways. To the extent Jackson wishes the bankruptcy court relied on public records from the *Leviston*

case, the very case he cites explains that the court could have referred to public records but was under no such obligation.  *See Blue Tree Hotels Inv. (Canada), Ltd. V. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) ("But we <u>may</u> also look to public records, including complaints filed in state court, in deciding a motion to dismiss.") (emphasis added).  Jackson is asking the Court to review the extensive *Leviston* trial transcript and exercise its judgment as to which evidence he would have included in his pleading.  That is not the role of the neutral arbiter, it is the role of the party's attorney.  In any event, a plaintiff cannot amend his pleading through a memorandum or other document, especially not on appeal. *See Auguste v. Dep't of Corr.*, 424 F. Supp. 2d 363, 368 (D. Conn. 2006) (stating plaintiff "cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment").

The Court will also briefly address Appellees' reference to an attorney lien. Under New York law, when an attorney is discharged but the client has not paid its fees, "a retaining lien entitles an attorney to keep, as security against payment of fees, all client papers and property, including money, that come into the attorney's possession in the course of employment, unless the attorney is discharged for good cause."  *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir. 1991) (citing *People v. Keefe*, 50 N.Y.2d 149, 155–56 (1980)); *Gardner-Alfred v. Fed. Reserve Bank of New York*, 2022 WL 17961594, at *2 (S.D.N.Y. Dec. 27, 2022).  "It is settled state law that a court cannot order the client's property transferred elsewhere until and unless (i) the court determines (or the parties agree to) the value of the attorney's services <u>and</u> (ii) the client either pays or posts adequate

security to cover that amount." *Id.* at 626−27 (emphasis added); *SEC v. Ryan*, 747 F. Supp. 2d 355, 369 (N.D.N.Y. 2010) ("As a general proposition, before a lawyer is required to surrender the files, which are subject to this lien, to either the client or a substituted attorney, the outstanding legal fees must be paid or adequate security for the payment must be posted.").

The Amended Counterclaims make no mention of a retainer lien, let alone allege that Appellees improperly withheld documents pursuant to one.  It simply states that disputes over Appellees' invoices "and Jackson's dissatisfaction with Reed Smith's performance of legal services, resulted in Jackson's general counsel discharging Reed Smith on behalf of Jackson."  (AP ECF 22 ¶ 115.)  In the Reply, Jackson acknowledges the trial court in the *Leviston* action determined Reed Smith could validly assert a retaining lien, but he argues for the first time the retainer lien was "improper because it was premised on a $500,000 invoice that was not outstanding when Jackson terminated Appellees and was not mentioned by Appellees as a condition to their promise to cooperate in transitioning the file to Bickel."  (ECF 29 (Reply) at 23.)  To the extent Jackson wishes the bankruptcy court assessed the public record, this Court notes that Jackson's replacement counsel agreed Reed Smith was <u>not</u> terminated for cause (AP ECF 24-2 at A-325– 26, 339), stated that Jackson was simply disappointed with the large fee (*see id.*), and represented that Jackson agreed to posting a bond to obtain the documents withheld by the lien (*see id.* id. at A-335–37).  *See Resolution Trust*, 949 F.2d at 626. Accordingly, the dismissal of this breach of fiduciary claim is AFFIRMED.

E.    Summary Judgment: Causation

Jackson organizes his appeal of the summary judgment rulings into two categories: errors related to the bankruptcy court's a) findings of fact and b) conclusions of law.  The more prudent structure is not based on the type of conclusions drawn, but rather on the elements themselves.  Jackson appeals findings of fact and conclusions of law related to breach and causation.  The Court addresses causation first.

The bankruptcy court determined that, assuming Appellees' conduct breached their duty, Jackson did not establish a triable issue of fact that damages could have been mitigated or absolved but for their breach.  (*See* AP ECF 395 at 54–56.)  The bankruptcy court made two rulings relevant to this discussion. First, the court found there was no evidence (and Jackson did not argue there was) that the Three Uncalled Witnesses would have mitigated or eliminated damages if called.  (*See id.* at 55.) Second, the court concluded replacement counsel's new trial strategy broke the chain of causation.  (*See id.* at 55–56.)

Jackson challenges both rulings.  With respect to the first, Jackson argues the bankruptcy court overlooked direct evidence that replacement counsel sought to adjourn trial and reopen discovery.  (*See* ECF 24 at 45.)  As for the second, Jackson argues the bankruptcy court "offered no authority for the proposition that Jackson was required to proceed with Appellees' chosen trial strategy in order to preserve his malpractice claim" and discusses one New York trial court case, *Feinberg v. Boros*, No. 0108498/2003, 2007 WL 2815269 (Sup. Ct. N.Y. Cnty. Sep. 04, 2007) in support of his position.  (*Id.* at 46–48.)

37

Appellees lodges three counterarguments.  As a general matter, Appellees point out Jackson still has not provided any evidence that the testimony from the Three Uncalled Witnesses would have mitigated or absolved damages.  (*See* ECF 27 at 24–25.)  With respect to the *Leviston* trial, Appellees argue replacement counsel had enough time to prepare for the trial and instead chose a different trial strategy.  (*See id.* at 26–27, 26–38.)  They also contend that replacement counsel had the opportunity to correct the alleged negligence post-trial but failed to do so.[11]  (*See id.* at 27.)

In Jackson's reply, he argues that he would not have been able to reopen discovery given that a note of issue and certificate of readiness had already been filed.  He cited to New York's leading treatise on civil practice as well as the hearing on May 1, 2015, in which Judge Wooten denied his request to adjourn the trial date and take discovery.  (ECF 29 at 10–11.)

"Under New York law, to establish the elements of proximate cause and actual damages, where the injury is the value of the claim lost, the client must meet the 'case within a case' requirement, demonstrating that 'but for' the attorney's conduct the client would have prevailed in the underlying matter or would not have sustained any ascertainable damages."  *Weil*, 10 A.D.3d at 271–72; *Reibman v. Senir*, 302 A.D.2d 290, 290–91 (N.Y. App. Div. 1st Div. 2003) (explaining "another way" of stating "plaintiff would have prevailed in the matter in question or would

---

[11] Appellees also argue that Jackson's settlement broke the chain of causation.  Because the bankruptcy court stated it "is not convinced the settlement here should be viewed as a break in the causation chain" and chose not to address the issue "since the change in counsel suffices," and Jackson did not appeal this issue, the Court will not address it.

not have sustained any ascertainable damages" is "proving a 'case within a case'").

"[I]t is well-settled that the introduction of new counsel serves as an intervening cause in a legal malpractice claim, severing the chain of causation between the negligent actions of an attorney and a plaintiff's injuries, so long as new counsel has 'sufficient opportunity to protect the plaintiffs' rights.'" *Schutz v. Kagan, Lubic, Lepper, Finkelstein & Gold, LLP*, 2013 WL 3357921, at *6 (S.D.N.Y. July 2, 2013) (quoting *Perks v. Lauto & Garabedian*, 306 A.D.2d 261, 262 (N.Y. App. Div. 2d Dep't 2003)) (citing cases).  For New York courts, what constitutes a "sufficient opportunity" does not appear to be tightly tethered to an amount of time. Rather, courts assess the specific context, including time, replacement counsel's subsequent actions, and events that took place after initial counsel's termination. *See, e.g., Schutz*, 2013 WL 3357921, at *2 (where replacement counsel took over individual condominium owner's representation five months before the condo board entered into a settlement agreement, the court found representation during settlement was replacement counsel's obligation and subsequent voting on the settlement constituted "intervening acts"); *Boye v. Rubin & Bailin*, 152 A.D.3d 1, 9–10 (N.Y. App. Div. 1st Dep't 2017) ("Further, a legal malpractice claim cannot be sustained where [i]t is clear that the proximate cause of any damages sustained by plaintiff was not the alleged malpractice of defendants, but rather the intervening and superseding failure of plaintiff's successor attorney[ ].") (internal quotation marks omitted); *Alden v. Brindisi, Murad, Brindisi, Pealman, Julian, Pertz (People's Lawyer)*, 91 A.D.3d 1311, 1311 (N.Y. App. Div. 4th Dep't 2012) ("The proximate cause

of any damages sustained by plaintiff was not the alleged legal malpractice of defendant but, rather, … either 'the intervening and superseding failure' of plaintiff to retain successor counsel in a timely manner or the failure of successor counsel to commence a timely medical malpractice action on plaintiff's behalf."); *Perks*, 306 A.D.2d at 262 (finding that hiring new counsel "two months before the plaintiffs settled their claim against the driver" was "sufficient opportunity"). *C.f. Bondram v. Ruskin Moscou Faltischek, P.C.*, 175 A.D.3d 586, 591 (N.Y. App. Div. 2d Dep't 2019) (finding at the pleading stage that defendants "failed to conclusively demonstrate" plaintiff's replacement attorney "had a sufficient opportunity to correct their alleged error in failing to amend the petition" because the defendant represented plaintiff when a voluntary amendment "could have significantly reduced the prospect" of a negative finding from the court); *Nimkoff Rosenfeld & Schechter, LLP v. RKO Props., Ltd.*, 2019 WL 13183563, at *9 (S.D.N.Y. Jan. 31, 2019) (finding that replacing counsel "9 days prior to the expiration of the lis pendens and 8 days prior to the date of final settlement" did not give replacement counsel "sufficient opportunity to protect plaintiff's rights").

Jackson cites *Feinberg v. Boros*, No. 0108498/2003, 2007 WL 2815269 (Sup. Ct. N.Y. Cnty. Sep. 04, 2007), to support his position that retaining new counsel did not automatically break the chain of causation. The *Feinberg* plaintiff filed a legal malpractice claim against the law firm that initially represented him in an arbitration proceeding resulting from a failed purchase and sale between the plaintiff and his former business partner. *Id.* at *1. After the arbitration award was delivered, the law firm failed to advise the plaintiff to pursue a "limiting agreement" with the

former business partner to limit the collateral estoppel effect of the award.  The *Feinberg* plaintiff was therefore collaterally estopped from pursuing damages from the accounting firm that advised the plaintiff on the purchase agreement.

The *Feinberg* plaintiff alleged the law firm committed legal malpractice for failing to advise him about the limiting agreement.  The trial court denied summary judgment, finding that "there is no evidence here which establishes, as a matter of law, that the Plaintiff's loss on his [accounting firm] claims was caused by reasons unrelated to Appellees' failure to advise."  *Id.* at *4. The trial court also determined that there existed a triable issue of fact as to whether replacement counsel's failure to pursue a limiting agreement was due to the fact they did not have a sufficient opportunity to do so.  There was evidence that the plaintiff believed the limiting agreement would need to be signed by February 2000, that defendant counsel represented the plaintiff during the key period when he should have been advised about the limiting agreement, that the former business partner had credibility issues, and that new counsel's pursuit of a limiting agreement in May 2000 may not have been feasible.  *See id.* at *5–7.

Jackson's circumstance differs from *Feinberg*.  In *Feinberg*, the plaintiff's lawsuit against the accounting firm was dismissed because of collateral estoppel—this outcome would have been avoided if initial counsel properly advised him and he entered into the limiting agreement.  Here, there are many more superseding events—which are part of the undisputed record—that could have resulted in Jackson's loss at trial.  Bickel entered an appearance on March 28, 2015, 11 weeks before trial; chose to enter an appearance without having reviewed the entire file;

did not file any kind of motion until April 27; filed numerous motions, including to postpone trial and reopen discovery, but never stated that deposing the Three Uncalled Witnesses was necessary; and explicitly stated that Jackson was not unhappy with the quality of Reed Smith's work (rather, just the price tag). (*See* ECF 24-2 at A-306–43.)  These actions from replacement counsel intervened and broke the chain of causation.  *See Boye*, 152 A.D.3d at 9–10 (stating replacement counsel's withdrawal of two meritorious claims and failure to seek default judgment were intervening failures).

Furthermore, Jackson's contention that Appellees' failure to conduct discovery of the Three Uncalled Witnesses before the 2012 Stipulation disadvantaged him at trial is speculation.  While it is true that replacement counsel brought an order to show cause seeking to adjourn trial and pursue discovery, replacement counsel did not explain why the failure to conduct that discovery would be detrimental to their trial strategy—instead, they sought to reopen discovery based on "newly discovered evidence" of the ThisIsSabrinasSin.Ning.com.  (*See* ECF 24-2 at A-306–43.)  Also, replacement counsel did not try to list the Three Uncalled Witnesses because counsel felt constrained by the 2012 Stipulation.  This means that Judge Wooten was never made aware that missing discovery was, according to Jackson, essential to replacement counsel's trial strategy.  If Judge Wooten had known the import of these witnesses, it is possible he would have permitted testimony at trial.  But without having made any attempt to list these witnesses at all, all Jackson can do is speculate the court would have denied his request.  *See Somma v. Dansker &*

*Aspromonte Assoc.*, 44 A.D.3d 376, 377 (N.Y. App. Div. 1st Dep't 2007) ("Plaintiff's claim that the federal court in the underlying action would not have permitted amendment of a pre-trial order filed by defendants is speculative.").   Such speculation is insufficient to establish proximate cause.[12]   *Brooks v. Lewin*, 21 A.D.3d 731, 734–35 (N.Y. App. Div. 1st Dep't 2005) ("Plaintiff nonetheless asserts that a number of events which occurred after she severed her relationship with MSI could have been prevented if the law firm made the motion for the injunction. However, speculation on future events are insufficient to establish that the defendant lawyer's malpractice, if any, was a proximate cause of any such loss.")

In any event, upon reviewing the record, the Court agrees with the bankruptcy court that Jackson failed to establish evidence proving his damages would have been mitigated or absolved "but for" Appellees' conduct.   Neither Murray nor the Internet Provider were ever deposed, whether in the *Leviston* case or this bankruptcy proceeding.   The Internet Provider's sole document merely states the date on which ThisisSabrinasSin.Ning.com was created and deleted. (AP ECF 335-43.)   To the extent Jackson has personal knowledge about the conversation with Murray, as the Court explained, Murray could not have given consent on behalf of Leviston.   Indeed, Murray's statement that Leviston consented to the publication could not be used to show she did in fact consent, as his statement would be inadmissible hearsay.   *See* Fed. R. Evid. 801(c); Fed. R. Civ. P. 56(c)(1).   As for Rick Ross, his deposition and affidavit did not aid Jackson's

---

[12] If it were, any client nervous about trial would be incentivized to fire their lawyer on the eve of trial with the knowledge that a malpractice lawsuit could serve as a viable way to fund a loss at trial.

defense to liability or damages.  (*See* ECF 24-6 at A-1387, ECF 24-7 at 1587–1629; AP ECF 302-17).)   Accordingly, the bankruptcy court's ruling on causation is AFFIRMED.

### F.  Summary Judgment: Breach

Jackson's failure to establish causation means that he could not succeed at trial.  *See Stonewall Corp. v. Conestoga Title Ins. Co.*, 678 F. Supp. 2d 203, 209 (S.D.N.Y. 2010) ("[W]here the client cannot establish another requisite element of the claim as a matter of law, summary judgment should be granted.").  Still, the Court will address his arguments on breach.

An attorney breaches his duty when he "fail[s] to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession…."  *Nomura Asset Capital Corp. v. Cadwalader, Wickersham & Taft LLP*, 26 N.Y.3d 40, 49–50 (N.Y. 2015) (internal citation omitted).  This standard does not require an attorney to be mistake-free.  "Generally, where allegations involve errors in the exercise of an attorney's professional judgment in areas such as strategy, the selection of appropriate evidence or argument, they are not actionable as malpractice."  *Bixby v. Somerville*, 62 A.D.3d 1137, 1140 (N.Y. App. Div. 3d Dep't 2009); *see Rosner v. Paley*, 65 N.Y.2d 736, 738 (N.Y. 1985) (stating an attorney's "error of judgment" or "selection of one among several reasonable courses of action" is not malpractice); *Stonewall*, 678 F. Supp. 2d at 209 (Allegations that amount to nothing more than a 'dissatisfaction with strategic choices' will not support a malpractice claim as a matter of law.") (quoting *Bernstein v. Oppenheim & Co.*, 160 A.D.2d 428, 490 (N.Y. App. Div. 1st Dep't 1990).  An attorney is instead

"held liable for 'ignorance of the rules of practice, failure to comply with conditions precedent to suit, or for his neglect to prosecute or defend an action.'" *Achtman v. Kirby, McInerney &Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (quoting *Bernstein v. Oppenheim & Co.*, 160 A.D.2d 428, 430 (N.Y. App. Div. 1st Dep't 1990).

Jackson has not submitted any evidence establishing Appellees ignored a rule of practice, failed to comply with his conditions precedent to suit, or failed to defend the action.  Indeed, Jackson appears to concede that Appellees' decision not to seek discovery from the Three Uncalled Witnesses was a strategic choice. (*See* ECF 24 at 41.)  Upon reviewing the record, the parties' briefing, and the bankruptcy court's ruling, this Court AFFIRMS the bankruptcy court's conclusion as to breach.

### 1.  Violation of Professional Conduct

Jackson first argues that Appellees failed to communicate their strategy in violation of Rule 1.4(a) of the New York Rules of Professional Conduct, and that this failure violates the "attorney judgment rule."  This argument appears to concede that Appellees' decision not to seek discovery from the Three Uncalled Witnesses was a strategic choice. (*See* ECF 24 at 41.) Jackson instead takes issue with the bankruptcy court's finding that Appellees' particular strategic choice was <u>reasonable</u> and posits that the "'attorney judgment rule' is not so expansive and does not obviate and attorney's obligation to communicate with the client before making critical decisions."  *See id.*

The bankruptcy court did not engage with Jackson's Rule 1.4 violation argument.  Perhaps this is because this failure to <u>communicate</u> is based on facts

entirely distinct from the failure to <u>conduct discovery</u> allegations related to Count 2—a separate claim which Jackson never alleged in the counterclaims and which is properly resolved through the New York Bar's disciplinary process. *See Cohen v. Kachroo*, 115 A.D.3d 512, 513 (N.Y. App. Div. 1st Dep't 2014) ("To the extent that plaintiff seeks to allege malpractice based on a violation of the New York Rules of Professional Conduct, such an alleged violation does not, without more, support a malpractice claim."); N.Y. R. Prof. Conduct, Scope[11] ("Failure to comply with an obligation or prohibition imposed by a Rule is a basis for invoking the disciplinary process."); N.Y. R. Prof. Conduct, R. 8.5 (Disciplinary Authority and Choice of Law).

Jackson cites *Ayala v. Fischman*, No. 97 Civ. 6698 (LLM), 1998 WL 726005 (S.D.N.Y. 1998) to support his position that an attorney's failure to communicate could support a legal malpractice claim. There, the plaintiff retained the lawyer to represent him for damages he sustained in an automobile accident. *See id.* at *1. During trial, defense counsel offered two settlements—first for $500,000 and then for $750,000—which, after speaking with his lawyer, the plaintiff rejected. *See id.* The jury ultimately awarded him $273,000 but, because they dismissed the case against certain defendants and the remaining defendant had few distributable assets, the plaintiff only recovered $12,100. *See id.* at *2. The trial court denied summary judgment as to the legal malpractice claim, ruling that there existed a triable issue of fact as to whether the attorney failed to adequately advise his client. *See id.* at *3.

This case differs from *Ayala* in a key respect. There, the trial court never discussed Rule 1.4 nor did it hold that an attorney commits malpractice simply for

46

violating this rule of professional conduct.  Accordingly, this case fails to support Jackson's position that Appellees' purported failure to communicate the trial strategy rendered the strategy unreasonable.  The failure to communicate—which if true was an entirely separate issue—should have been brought through New York's disciplinary process.  *See* N.Y. R. Prof. Conduct, Scope[11] & R. 8.5.

In addition, in *Ayala*, the failure to communicate involved settlement for which the client has the ultimate authority as opposed to trial strategy for which the client is expected to defer. *See* N.Y. R. Prof. Conduct R. 1.2(a) & cmts. [1]–[2]. It was undisputed that the *Ayala* plaintiff had direct conversations with the lawyer about settlement, and so it was up to the jury to decide the content of those conversations and whether the lawyer failed to adequately advise the client about settlement.  Here, Jackson has not provided any evidence to dispute the fact that Appellees communicated the details of the 2012 Stipulation to his representatives. The retainer agreement directed Appellees to communicate with Jackson's liaison: "To the extent practical, Reed Smith has interacted primarily and directly with your attorney, Theodor K. Sedlmayr of Sedlmayr & Associates as a co-counsel, and you have directed Reed Smith LLP where and when practical to interact with Mr. Sedlmayr as your liaison."  (AP ECF 22-8 at 3.)  At the time of the 2012 Stipulation, Jackson employed Sedlmayr as his attorney and Martin as Vice President of his company.  In other words, both individuals were Jackson's agents charged with acting on Jackson's behalf.  *See* Restatement (Second) of Agency § 13 (Agent as Fiduciary) (1958) & Restatement (Third) of Agency § 2.04 (Respondeat Superior) (2006).  Farber testified that Martin informed him that Jackson wanted them to

speak directly to Martin "as a client representative," and so he followed this direction when he informed her of their plan to enter into the 2012 Stipulation. (ECF 24-10 at A-2369.)  While the Retainer stated communications should be directed to Sedlmayr "to the extent practical," there is no evidence that speaking with Martin about the 2012 Stipulation was not the practical choice.  Jackson testified that— while he spoke directly with Raymond about settlement because it "[n]eeds to come to me at that point," he did not speak directly with Raymond about witnesses. (*Id.* at A-2356.)

### 2.  Local 56(a)(1) Statements Deemed Admitted

The bankruptcy court deemed seven paragraphs of Appellees' 56(a)(1) Statement admitted on the grounds that Jackson failed to deny the purportedly undisputed fact or submit contradictory evidence.  (*See* AP ECF 395 at 8–9.)  In summary, these paragraphs—13 through 20, 22, 55, 56 and 59—relate to Appellees' considerations, assessments and decisions about discovery and trial strategy. The bankruptcy court observed that Jackson "frequently denied an asserted fact by stating supplementary information rather than denying the asserted fact or proffering factual evidence to controvert it."  (*Id.* at 8.)  While the court deemed these paragraphs admitted, it did not refuse to consider the supplementary evidence Jackson provided.  Nonetheless, Jackson argues he properly disputed these statements and submitted evidence that challenged the reasonableness of these purported decisions.  (*See* ECF 24 at 33–37.)  Appellees state Jackson failed to submit admissible evidence, because he previously relied on attorney-client privilege and the work product doctrine to shield Appellees from obtaining

evidence about his attorney's mental impressions and also submitted a declaration that contradicted his own testimony.  (*See* ECF 27 at 33–34.)

Local Rule 56(a) states that any material fact in the Local Rule 56(a)1 Statement that is supported by evidence "will be deemed admitted (solely for the purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement…."   D. Conn. L. Civ. R. 56(a)1 (emphasis added).   A non-movant may admit, deny, and/or object to a 56(a)1 Statement.  *See* D. Conn. L. Civ. R. 56(a)2. Local Rule 56(a)3 sets the requirements for properly denying a 56(a)1 Statement: "each denial in an opponent's Local Rule 56(a)2 Statement[ ] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial."  D. Conn. L. Civ. R. 56(a)(3).  "When a party fails to appropriately deny material facts set forth in the movant's Rule 56(a)(1) statement, those facts are deemed admitted."  *See Knight v. Hartford Police Dep't*, No. 3:04cv969 (PCD), 2006 WL 1438649, at *4 (D. Conn. May 22, 2006)

The Court has evaluated the paragraphs at issue and finds that Jackson's denials and rebuttal evidence do not controvert the particular 56(a)1 Statement.  By denying these paragraphs, Jackson is stating that these facts are not true.  *See Denial*, Black's Law Dictionary (11th ed. 2019) (defining "denial" as "a statement that something is not true, esp. after someone else has suggested that it is or might be true.").   Yet in several paragraphs, the evidence he submitted does not actually attack the statement's veracity.

The first category concerns Jackson's efforts to rebut evidence about Appellees' discovery and trial strategy.  For example, in paragraph 13, Appellees stated, "In structuring Jackson's defense, Reed Smith concluded, in its professional judgment, that the best way to prove Jackson's state of mind would be through Jackson's own testimony about his purposes in posting the video." (AP ECF 304 (56(a)(1) Stmt.) ¶ 13.)   Jackson denied this statement but did not submit evidence challenging the fact that Reed Smith concluded Jackson should testify about his state of mind; rather, Jackson submitted evidence that Reed Smith <u>failed to communicate</u> its conclusion to him.  (*See* AP ECF 334 (56(a)(2) Stmt.) ¶ 13.)  Jackson made a similar "failure to communicate" argument in paragraphs 14, 15, 16, 19, 20, and 22.  Simply put, it's impossible to fail to communicate a strategy unless a strategy existed.  Accordingly, the bankruptcy court did not err with respect to these paragraphs. *See Controvert*, Black Law Dictionary (11th ed. 2019) (defining "controvert" as "[t]o dispute or contest; esp., to deny (as an allegation in a pleading) or oppose in argument.")

The second category concerns four paragraphs (17, 18, 55, and 59) in which Jackson challenges the way Appellees characterize witnesses' anticipated testimony.  In paragraphs 17 and 18, Jackson denied Appellees' characterization that Singh and Villemeur would testify they "posted" the Video on BooBooTV, arguing instead that the testimony from these two witnesses as well as Leviston's expert would be the Video was "streamed."  (AP ECF 334 ¶¶ 17, 18.) To the extent this fact is disputed, whether the Video was "streamed" or "posted" is immaterial as to whether Appellees' discovery decisions impacted damages.  *See Anderson*

*v. Liberty Lobby*, 477 U.S. 242, 247 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.")  In paragraph 55, Jackson denied Appellees' description of Rick Ross' anticipated testimony.  Upon reviewing Rick Ross' deposition and affidavit, the Court concludes Appellees' characterization of the testimony is accurate.  In paragraph 59, Jackson denied Appellees' characterization that his standard of care expert "testified that he cannot quantify Jackson's damages or the purported mitigation amount." (AP ECF 334 ¶ 59.)  Jackson presents evidence his expert testified the Three Uncalled Witnesses "would have mitigated the quantum of his damages." (*Id.*)  Testimony that damages would have been mitigated does not controvert the fact that the expert could not quantify the damages.  Accordingly, the bankruptcy court did not err as to these paragraphs either.

Lastly, the Court finds that Jackson had personal knowledge sufficient to dispute paragraph 56—"There is no evidence of what Murray would have said if called to testify in the Leviston Matter," (*Id.* ¶ 56)—but that Murray's testimony (as described by Jackson) would have been harmful to his case.  Jackson testified that Murray went to Jackson's office, showed him the tape, inquired about the possibility of doing a book deal, and stated Leviston did not care about publishing the Video.  (*See id.* (citing AP ECF 335-3 (Summ. J. Opp'n Ex. 2, Jackson Dep.) at 10:23-11:25).)  But he also testified, "And [Murray] was like, Nah, she don't care. Like, let's just put it out there anyway and see if possibly we could do a book or

something else after that comes from it."  (AP ECF 335-3 at 11:21-25.)  The phrases "she don't care" and "let's just put it out there anyway" is not consent.  *See, e.g., In re SunEdison, Inc.*, 576 B.R. 453, 458 (S.D.N.Y. 2017) (in contract law, "Absent a duty to speak, silence does not constitute consent"); *Thoreson v. Penthouse Int'l, Inc.*, 179 A.D.2d 29, 31 (N.Y. App. Div. 1st Dep't 1992) (in sexual harassment cases, a person's past sexual activity "does not preclude the subsequent withdrawal of consent to exploitation, nor does it necessarily imply consent to sexual encounters of the type complained of").  This testimony would have been catastrophic to Jackson's defense that Murray told him Leviston consented to the publication.

### 3.  Expert Lupkin

The bankruptcy court concluded that expert testimony was warranted for his legal malpractice claim.  Neither party challenged the experts' qualifications or opinions at the summary judgment stage.

Upon reviewing the experts' opinions, the bankruptcy court disregarded several opinions of Jackson's expert, Attorney Lupkin.  First, the court found that Attorney Lupkin's "opinion that informal discovery must be undertaken" and that witnesses likely had relevant evidence in their custody was "conclusory" and "speculative" because he "did not have a basis to know whether informal questioning would have produced any fruitful information" from Ross or the Internet Provider.  (AP ECF 395 at 48, 51.)  Second, the court concluded Attorney Lupkin used a more burdensome standard of care than required.  (*See id.* at 49.)  Third, Jackson failed to file the appendices cited in Attorney Lupkin's report, which included a list of assumed facts and the materials he reviewed.  (*See id.* at 49.)

Fourth, Attorney Lupkin did not opine about Appellees' reasonableness, (*see id.*), but the court determined his opinion that Appellees' strategy to rely on Jackson's testimony "was suboptimal" failed to support a malpractice claim, (*see id.* at 53).

Jackson argues the bankruptcy court erred "by rejecting Attorney Lupkin's opinion on the basis that he 'failed to cite to any facts supporting' his conclusion that the Three Uncalled Witnesses possessed relevant evidence that Appellees should have pursued."  (ECF 24 at 38 (quoting Bankr. Ct. Dec. on Summ. J.).) Jackson points out the court "focused on two paragraphs in Attorney Lupkin's opinion that did not to record evidence cite" and argued the court overlooked "dozens of other paragraphs" citing evidence to support his opinion.  (*Id.*) Jackson then turns to the parts of the record that he believes supports a finding that the key witnesses had relevant evidence.   (*See id.*)   He argues the bankruptcy court misstated Attorney Lupkin's opinion as holding Appellees to a higher standard of care than is required for legal malpractice. (*Id.* at 49–50.)

Appellees avoid the issue by arguing that summary judgment can be granted despite "dueling expert witness reports."  (ECF 27 at 34.)  They point instead to the section of their brief citing the record they contend establishes Appellees acted within their standard of care.  (*See id.* at 35.)

The Federal Rules of Evidence apply to adversary proceedings.  *See* Fed. R. Bankr. P. 9017 ("The Federal Rules of Evidence … apply in cases under the Code."); *Xiao v. Chorches*, 610 B.R. 183, 189 (D. Conn. 2019) (acknowledging Rule 9017 applies to adversary proceedings); *In re CBI Holding Co., Inc.*, 419 B.R. 553 (S.D.N.Y. 2009) (reviewing expert testimony admission under Federal Rule of

Evidence 702 in an adversary proceeding involving auditor malpractice under New York state law).  Rule 702 permits a witness to testify as a qualified expert <u>only if</u>: (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based upon sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods;" and (4) "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions…."  *Nimely v. City of N.Y.*, 414 F.3d 381, 395 (2d Cir. 2005).  Unlike a lay witness, an expert is given "wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."   *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993).

The trial court "functions as the gatekeeper for expert testimony" to admit reliable and relevant expert testimony, and this role applies with equal force at summary judgment as well as trial.  *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).  But "an expert's report is not a talisman against summary judgment."  *Id.*  Expert testimony that is "speculative or conjectural" or "based on speculative assumptions" should be excluded.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008).  Expert opinions  should also be excluded if it is "unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison."  *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009).  Where "there is simply too great an analytical gap between the data and the opinion proffered," expert opinions must

be excluded.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Courts within this district have raised *Daubert* concerns *sua sponte*.  *See, e.g., Fraser v. Wyeth, Inc.*, 992 F. Supp. 2d 68, 97 (D. Conn. 2014); *AU New Haven, LLC v. YKK Corp.*, 15-CV-3411 (GHW)(SN), 2019 WL 1254763, at *13 n.88 (S.D.N.Y. Mar. 19, 2019).  A court may not assess the weight of an expert's opinion, as doing so is straying from its role of gatekeeper.  *See Richardson v. Correctional Med. Care, Inc.*, 2023 WL 3490904, at *3 (2d Cir. 2023) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

After reviewing the evidence, the Court concludes that Attorney Lupkin's report did not satisfy the requirements under Rule 702 and *Daubert.*  Simply put, the evidence does not show that Attorney Lupkin's opinions were "based on sufficient facts or data," or that he "reliably applied the principles and methods to the facts of the case," because he does not disclose the facts or evidence upon which he relied.  Fed. R. Evid. 702(b), (d).  Accordingly, the bankruptcy court did not err.  *See Restivo v. Hessemann*, 846 F.3d 547, 575 (2d Cir. 2017) (applying "abuse of discretion" to expert admissibility and stating the standard is "a highly deferential standard, and a ruling on the admissibility of expert testimony is to be sustained unless manifestly erroneous").  *C.f. Lore v. City of Syracuse*, 670 F.3d 127, 155 (2d Cir. 2012) ("[A]n erroneous evidentiary ruling warrants a new trial only when a substantial right of a party is affected, as when a jury's judgment would be swayed in a material fashion by the error.").  In any event, even if the bankruptcy court considered both expert opinions, summary judgment would have been

entered on the basis of causation. *See Richards v. Direct Energy Servs., LLC*, 915

F. 3d 88, 96 (2d Cir. 2019) (affirming summary judgment despite "dueling experts").

IV.     **CONCLUSION**

For the above reasons, the Court AFFIRMS the bankruptcy court's rulings.

The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District
Judge

Dated this day in Hartford, Connecticut: June 30, 2023